**Case No. 21-50574**

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

CHARLES E. EPLEY,

*Plaintiff-Appellant*,

v.

SAMUEL B. ITIE, *Medical Official at Lynaugh*; ROXIE INGRAM, *Medical Official at Lynaugh*; M. FUENTES, *Practice Manager at Lynaugh*; MICHELLE D. SELLERS, *Classification at Lynaugh*; PAUL M. ROBINSON, *Sergeant at Lynaugh*; HEATHER M. GONZALES, *Sergeant at Lynaugh*; RAUL MELERO, *Captain at Lynaugh*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of Texas
No. 4:18-cv-00034-DC, Hon. Walter David Counts, III

## SUPPLEMENTAL BRIEF FOR PLAINTIFF-APPELLANT

Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Ave. NW #26152
Washington, D.C. 20001
(202) 455-4399
sam@rightsbehindbars.org

Matthew N. Drecun
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mdrecun@kellogghansen.com

*Attorneys for Plaintiff-Appellant Charles E. Epley*

August 2, 2023

## CERTIFICATE OF INTERESTED PERSONS

No. 21-50574

CHARLES E. EPLEY,

*Plaintiff-Appellant*,

v.

SAMUEL B. ITIE, *Medical Official at Lynaugh*; ROXIE INGRAM, *Medical Official at Lynaugh*; M. FUENTES, *Practice Manager at Lynaugh*; MICHELLE D. SELLERS, *Classification at Lynaugh*; PAUL M. ROBINSON, *Sergeant at Lynaugh*; HEATHER M. GONZALES, *Sergeant at Lynaugh*; RAUL MELERO, *Captain at Lynaugh*,

*Defendants-Appellees*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. Charles E. Epley, Plaintiff-Appellant

2. Samuel Weiss and Matthew N. Drecun, counsel for Plaintiff-Appellant

3. Samuel Itie, Roxie Ingram, M. Fuentes, Michelle D. Sellers, Paul M. Robinson, Heather M. Gonzales, and Raul Melero, Defendants-Appellees

4. Luis A. Suarez, counsel for Defendants-Appellees Ingram, Itie, and Fuentes

5. Alec Simpson, counsel for Defendants-Appellees Sellers, Robinson, Gonzales, and Melero

i

6.  Angela Colmenero, Ken Paxton, Brent Webster, Grant Dorfman, Shawn W. Cowles, and Shanna E. Molinare, counsel for Defendants-Appellees

/s/ Matthew N. Drecun

Matthew N. Drecun

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes oral argument would assist the Court because this appeal raises important questions concerning venue for civil litigation and the constitutional rights of prisoners.  Oral argument may also assist the Court's consideration of the multiple disputes of material fact arising from the case's complex summary-judgment record.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF AUTHORITIES ................................................................................v

INTRODUCTION ...............................................................................................1

STATEMENT OF JURISDICTION....................................................................3

STATEMENT OF ISSUES .................................................................................4

STATEMENT OF THE CASE............................................................................4

A.     Factual Background .................................................................................4

       1.     Epley's Vulnerabilities Were Clear When TDCJ Transferred Him Across Texas in 2016 .........................................................................5

       2.     Robinson Confiscated Epley's Medallion on June 2, 2016 .................6

       3.     Montford Officers' Use of Force Injured Epley Severely on June 6, 2016.........................................................................................6

       4.     Epley Suffered Further Injuries After Returning to Lynaugh...............7

B.     Procedural History ...............................................................................10

SUMMARY OF ARGUMENT .........................................................................12

STANDARD OF REVIEW ...............................................................................15

ARGUMENT .....................................................................................................16

I.     The District Court Erred By Severing and Transferring Epley's Case .........16

       A.     Venue Was Proper in the Northern District of Texas .........................16

       B.     The District Court Misapplied the Venue Statute ...............................19

    C.      Discretionary Severance and Transfer Were Improper......................22

II.    The District Court Erred By Rejecting Epley's Free-Exercise Claims.........26

    A.      Robinson and Ingram Violated Epley's Right to Free Exercise .........26

    B.      The Magistrate Judge Committed Both Factual and Legal Error .......29

        1.      Genuine issues of material fact exist regarding
                Appellees' actions .....................................................29

        2.      Appellees' actions were unreasonable .....................................32

III.    The District Court Erred By Rejecting Epley's Claims Against Itie And
Sellers For Denial Of Medical Care ...............................................35

    A.      Itie and Sellers Unconstitutionally Denied Medical Care to Epley ....35

    B.      The Magistrate Judge Failed to Consider Epley's Claims Fully ........41

        1.      The magistrate judge erroneously narrowed Epley's
                claim against Itie ......................................................41

        2.      The magistrate judge ignored Epley's summary-judgment
                response to Sellers.....................................................44

IV.    The District Court Erroneously Rejected Epley's Claim Against Sellers
For Failing To Protect Him ........................................................47

    A.      Sellers Failed to Protect Epley from Harm by Other Prisoners ..........47

    B.      The Magistrate Judge Committed Multiple Errors in Excusing
Sellers' Failure to Protect Epley...........................................51

V.    Counsel Should Be Appointed On Remand ..................................55

CONCLUSION .......................................................................56

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alpine View Co. v. Atlas Copco AB*,
205 F.3d 208 (5th Cir. 2000) ........................................................ 22

*Alvarez v. Akwitti*,
997 F.3d 211 (5th Cir. 2021) ........................................................ 48

*Atiyeh v. Capps*,
449 U.S. 1312 (1981) .................................................................... 55

*Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
571 U.S. 49 (2013) ................................................ 17, 18, 20, 21, 23

*Austin v. Johnson*,
328 F.3d 204 (5th Cir. 2003) ........................................................ 36

*Bankehead v. Mannix*,
983 F.2d 1061 (5th Cir. 1993) ...................................................... 26

*Bargher v. White*,
928 F.3d 439 (5th Cir. 2019) ........................................................ 52

*Butts v. Martin*,
877 F.3d 571 (5th Cir. 2017) ........................................................ 55

*Colle v. Brazos County, Tex.*,
981 F.2d 237 (5th Cir. 1993) ........................................................ 36

*Cruz v. Beto*,
405 U.S. 319 (1972) ...................................................................... 26

*Davis v. Fernandez*,
798 F.3d 290 (5th Cir. 2015) .............................................. 29, 45, 53

*Defense Distributed v. Bruck*,
30 F.4th 414 (5th Cir. 2022) .................................................. 23, 25

v

*Easter v. Powell*,
    467 F.3d 459 (5th Cir. 2006) ......................................................... 36

*EEOC v. Simbaki, Ltd.*,
    767 F.3d 475 (5th Cir. 2014) ......................................................... 44

*Empire Indem. Ins. Co. v. N/S Corp.*,
    571 F. App'x 344 (5th Cir. 2014) .................................................. 25

*Estelle v. Gamble*,
    429 U.S. 97 (1976) .................................................................. 35, 40

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ................................... 35, 37, 47, 48, 51, 54

*Frederking v. Cincinnati Ins. Co.*,
    929 F.3d 195 (5th Cir. 2019) .................................................. 43, 45

*Garcia v. Woman's Hosp. of Tex.*,
    97 F.3d 810 (5th Cir. 1996) ........................................................... 43

*Hardwick v. Brinson*,
    523 F.2d 798 (5th Cir. 1975) ......................................................... 21

*Harris v. Hegmann*,
    198 F.3d 153 (5th Cir. 1999) .................................................... 36, 39

*Hart v. Hairston*,
    343 F.3d 762 (5th Cir. 2003) ............................................ 30, 45, 53

*Horton v. Cockrell*,
    70 F.3d 397 (5th Cir. 1995) ............................................ 48, 50, 51

*Jackson v. Godwin*,
    400 F.2d 529 (5th Cir. 1968) ......................................................... 26

*Janes v. Hernandez*,
    215 F.3d 541 (5th Cir. 2000) ......................................................... 52

*Johnson v. Johnson*,
    385 F.3d 503 (5th Cir. 2004) ..................................... 8, 48, 49, 53

vi

*Jones v. Greninger*,
    188 F.3d 322 (5th Cir. 1999) .......................................................... 52

*Kay v. Bemis*,
    500 F.3d 1214 (10th Cir. 2007) .................................................... 26

*Leigh Ann H. v. Riesel Indep. Sch. Dist.*,
    18 F.4th 788 (5th Cir. 2021) ........................................................ 15

*Liaw Su Teng v. Skaarup Shipping Corp.*,
    743 F.2d 1140 (5th Cir. 1984) ...................................................... 23

*Locke v. Terry*,
    91 F.3d 140 (5th Cir. 1996), 1996 WL 400285 ............................ 49

*Longoria v. Texas*,
    473 F.3d 586 (5th Cir. 2006) ........................................................ 48

*Lozano v. Schubert*,
    41 F.4th 485 (5th Cir. 2022) ....................................... 4, 16, 21, 55

*Magallon v. Livingston*,
    453 F.3d 268 (5th Cir. 2006) ........................................................ 44

*Mayfield v. Texas Dep't of Crim. Just.*,
    529 F.3d 599 (5th Cir. 2008). ....................................................... 34

*McClintock v. School Bd. E. Feliciana Par.*,
    299 F. App'x 363 (5th Cir. 2008) ................................................. 18

*McFaul v. Valenzuela*,
    684 F.3d 564 (5th Cir. 2012) ......................................... 26, 33, 35

*Miller v. Johnson*,
    2020 WL 8361989 (E.D. Tex. Dec. 16, 2020) ............................. 52

*Mitchell v. Diaz*,
    2022 WL 4124797 (E.D. Cal. Sept. 9, 2022) ............................... 26

*Morgan v. Hubert*,
    459 F. App'x 321 (5th Cir. 2012) ................................................. 49

*Newton v. Stringfellow*,
    93 F. App'x 615 (5th Cir. 2004) .................................................... 25

*O'Lone v. Estate of Shabazz*,
    482 U.S. 342 (1987) ................................................................. 34

*Ortiz v. Downey*,
    561 F.3d 664 (7th Cir. 2009) ....................................................... 26

*Owens v. Hinsley*,
    635 F.3d 950 (7th Cir. 2011) ........................................... 29, 45, 53

*Rogers v. Jarrett*,
    63 F.4th 971 (5th Cir. 2023) ....................................................... 16

*Rolls Royce Corp., In re*,
    775 F.3d 671 (5th Cir. 2014) ................................... 21, 23, 24, 25

*Rush v. Fischer*,
    923 F. Supp. 2d 545 (S.D.N.Y. 2013) ........................................ 17

*Scott v. Mississippi Dep't of Corr.*,
    961 F.2d 77 (5th Cir. 1992) ........................................................ 28

*Shaheed-Muhammad v. Dipaolo*,
    138 F. Supp. 2d 99 (D. Mass. 2001) ......................................... 26

*Shatner v. Page*,
    2009 WL 260788 (S.D. Ill. Feb. 4, 2009) .................................. 26

*Sims v. Griffin*,
    35 F.4th 945 (5th Cir. 2022) ................................................. 36, 39

*Smiley v. Reno*,
    131 F. Supp. 2d 839 (W.D. La. 2001) ....................................... 17

*Spillman Dev. Grp., Ltd., In re*,
    710 F.3d 299 (5th Cir. 2013) ................................................ 15, 25

*Taxotere (Docetaxel) Prods. Liab. Litig., In re*,
    966 F.3d 351 (5th Cir. 2020) ...................................................... 43

*Turner v. Safley,*
　　482 U.S. 78 (1987) ........................................................................ 27

*Volkswagen AG, In re,*
　　371 F.3d 201 (5th Cir. 2004) ....................................................... 23

*Volkswagen of Am., Inc., In re,*
　　545 F.3d 304 (5th Cir. 2008) ........................................... 15, 22, 25

*W & T Offshore, Inc. v. Bernhardt,*
　　946 F.3d 227 (5th Cir. 2019) ....................................................... 15

*Walsh v. Louisiana High Sch. Athletic Ass'n,*
　　616 F.2d 152 (5th Cir. 1980) ....................................................... 33

*White v. Wexford Health Sources, Inc.,*
　　2012 WL 3913956 (N.D. Miss. Sept. 7, 2012) ........................... 17

*Williams v. Bowman,*
　　157 F. Supp. 2d 1103 (N.D. Cal. 2001) ....................................... 17

## CONSTITUTION

U.S. Const. amend. I ...................................................................... 2, 13, 26

U.S. Const. amend. VIII................................................... 2, 35, 39, 42, 47

## STATUTES

28 U.S.C. § 1391 ........................................................................ 17, 18, 22

28 U.S.C. § 1391(b) ......................................................................... 17, 20

28 U.S.C. § 1391(b)(1).................................................... 12, 17, 18, 19, 20

28 U.S.C. § 1391(b)(2)......................................................... 12, 18, 19

28 U.S.C. § 1391(c)(1).......................................................................... 17

28 U.S.C. § 1404(a) ................................................................. 10, 21, 22

28 U.S.C. § 1406(a) ..................................................................... 20, 21

28 U.S.C. § 1746 ................................................................. 29, 30, 33, 53

28 U.S.C. § 1915(e) .............................................................................. 11

28 U.S.C. § 1915(e)(2)(B) ................................................................... 41

42 U.S.C. § 1997e(e) ............................................................................ 52

## RULES

Fed. R. Civ. P. 20(a)(2)(A)-(B) ........................................................ 19

Fed. R. Civ. P. 56(a) .......................................................................... 16

## OTHER MATERIALS

*Epley v. Gonzalez*, No. 5:18-cv-00142-BQ (N.D. Tex.):

    ECF No. 38 ................................................................................ 19

    ECF No. 39 ................................................................................ 19

    ECF No. 43 ................................................................................ 22

    ECF No. 90 ................................................................................ 46

    ECF No. 123 .............................................................................. 46

Texas Dep't of Crim. Just., *Unit Directory – Lynaugh (LH)*,
    https://www.tdcj.texas.gov/unit_directory/lh.html ......................... 8

**INTRODUCTION**

This appeal arises from a hellish three-week span endured by former Texas prisoner Charles Epley in June 2016.  Before then, Epley served his prison sentence in relative peace at a unit near Houston.  He had a cell to himself because doctors recognized that mental and physical trauma he suffered at the hands of other prisoners in the 1990s, as well as his age and slight build, made him a potential victim.  But the Texas Department of Criminal Justice ("TDCJ") proceeded to transfer Epley between units seven times from late May to late June 2016, crisscrossing the state.  Epley's original suit—since severed—brought claims against defendants at three units in his tortuous trek:  the Lynaugh Unit near Fort Stockton, the Montford Unit near Lubbock, and the Robertson Unit near Abilene. This appeal challenges that severance and the district court's summary judgment for the Lynaugh defendants.

When Epley came to Lynaugh on June 2, 2016, a TDCJ sergeant, Appellee Paul Robinson, confiscated a religious medallion that Epley wore around his neck, even though it was TDCJ-approved.  Robinson had no reason to take the medallion, a crucial means of religious exercise for Epley and the only religious article he had.  Epley thus was deprived of the medallion's religious support when TDCJ transferred him to Montford later that day.

At Montford, a psychiatric prison, officers in riot gear forced Epley into a cell with three other prisoners, despite the single-cell restriction that had protected Epley for the preceding two decades. They used a harsh chemical agent on him and piled onto his body, slamming his head against the floor. The assault fractured his ribs, broke his nose, and caused him a concussion. TDCJ then returned Epley to Lynaugh on June 9, 2016.

Back at Lynaugh, in pain from his Montford injuries, Epley suffered a triple violation of clearly established constitutional rights. *First*, Robinson and Appellee Roxie Ingram violated his First Amendment right to free exercise by continuing to withhold the religious medallion Robinson confiscated on June 2 without justification.

*Second*, Appellee Samuel Itie, a Texas Tech University Health Sciences Center ("Texas Tech") physician's assistant, and Appellee Michelle Sellers, Lynaugh's Director of Classification, violated Epley's Eighth Amendment right to medical care for his Montford injuries. Itie recognized Epley needed a doctor's attention and possibly hospitalization, until Sellers intervened. After that, Itie provided only minimal care to Epley for his injuries and never arranged for hospitalization or a doctor's examination.

*Third*, Sellers violated Epley's Eighth Amendment right to protection from risks of serious harm. When Epley requested safekeeping housing because his

Montford injuries made him vulnerable to other inmates, Sellers refused. Other prisoners repeatedly assaulted and extorted Epley over the next two weeks, before TDCJ finally transferred him away from Lynaugh on June 23, ending his ordeal.

The district courts made multiple errors in processing Epley's claims against the Lynaugh defendants. The district court in the Northern District of Texas, Lubbock Division, erred by severing Epley's case based on a mistaken venue analysis, forcing Epley to litigate interrelated claims across three federal courts. The district court in the Western District of Texas then erred by granting summary judgment on Epley's free-exercise claims against Robinson and Ingram, his medical-needs claims against Itie and Sellers, and his failure-to-protect claim against Sellers. The magistrate judge's recommendations, adopted by the district court, repeatedly overlooked Epley's factual showings and made multiple legal errors in rejecting Epley's meritorious claims. This Court should reverse, consolidate Epley's case in Lubbock, and direct the appointment of counsel to assist him on remand.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291 because Epley timely appealed from a final judgment. ROA.19; ROA.797.

3

## STATEMENT OF ISSUES

1.     Whether the district court for the Northern District of Texas erred by severing and transferring portions of a case filed against only Texas residents, including numerous defendants residing in the Northern District.

2.     Whether the district court erred by rejecting Epley's free-exercise claims against Robinson and Ingram for confiscating and withholding his approved religious medallion, the sole means of exercising his religion he had.

3.     Whether the district court erred by rejecting Epley's medical-needs claims against Itie and Sellers for denying him emergency medical care for severe injuries he incurred at the Montford Unit.

4.     Whether the district court erred by rejecting Epley's failure-to-protect claim against Sellers for denying his request for safekeeping housing and placing him with the general population at the Lynaugh Unit despite Epley's heightened vulnerability resulting from his Montford injuries.

5.     Whether this Court should order appointment of counsel on remand.

## STATEMENT OF THE CASE

### A.     Factual Background

Because Appellees moved for summary judgment against Epley, all facts and inferences are viewed in the light most favorable to him.  *See Lozano v. Schubert*, 41 F.4th 485, 491 (5th Cir. 2022).

4

### 1.    Epley's Vulnerabilities Were Clear When TDCJ Transferred Him Across Texas in 2016

In 1994, early in his incarceration, Epley was beaten severely by other prisoners, causing him lasting mental and physical trauma.  ROA.1566.  He experienced frequent migraines, depression, and post-traumatic stress disorder ("PTSD") from then on, as well as significant difficulty adapting to the prison environment.  ROA.1347-1348; ROA.1500.  Recognizing these conditions, a psychiatrist at TDCJ's Jester IV psychiatric facility characterized Epley in 1996 as a "Potential Victim," needing special measures to "[e]nsure [he] is not a victim of physical or sexual abuse."  ROA.1500.  Accordingly, Epley's health classification dictated a single-cell housing assignment from at least 1996 through his release from TDCJ custody in February 2018.  ROA.464; ROA.470.

Despite his disabilities, Epley managed to pass much of his incarceration in relative safety at the Ramsey Unit, south of Houston.  ROA.1575-1576.  But in late May 2016, for no reason ever made clear to Epley, TDCJ sent him on a circuit of West Texas prisons, transferring him seven times in a month:  from Ramsey to Huntsville on May 27, 2016; to the Robertson Unit near Abilene on May 31; to the Lynaugh Unit near Fort Stockton on June 2; to the Montford Unit near Lubbock, also on June 2; back to Robertson on June 7; back to Lynaugh on June 9; back to Robertson on June 23; back to Huntsville on June 24; and then to the Stringfellow Unit near Ramsey on June 27.  ROA.3102.  At the time, Epley was 58 years old,

and though 5'11", he weighed only 141 pounds.  ROA.3153.

### 2. Robinson Confiscated Epley's Medallion on June 2, 2016

Epley arrived at Lynaugh on June 2 wearing a religious medallion around his neck.  ROA.475.  Epley's religious practice and beliefs are from European traditions that predate Christianity.  Epley Br. 57.  For Epley, the consolation of religious practice was a vital means of managing the pains and stresses of imprisonment.  ROA.475-476.  As part of his practice, Epley wore a religious medallion for years that symbolized and facilitated his connection with the divine.  Epley Br. 57; ROA.475-476.  Epley obtained the medallion from a TDCJ-approved vendor, and the Ramsey Unit's warden and chaplain signed off on Epley wearing it.  Epley Br. 57; ROA.1696; ROA.1794.

When Epley came to Lynaugh, the medallion was the only religious article he had.  ROA.475.  Despite it being officially approved, Sergeant Paul Robinson confiscated it from Epley.  ROA.1573-1574.  Robinson took the medallion without checking to see that it was approved or logging it with Lynaugh's duty property officer.  ROA.1574; ROA.1782.  Epley was transferred to Montford later that day.

### 3. Montford Officers' Use of Force Injured Epley Severely on June 6, 2016

On June 6, officers at Montford ordered Epley into a cell with three other prisoners, despite the single-cell restriction that had protected him for two decades.  ROA.1310.  The order triggered fear and confusion for Epley, symptoms of his

6

PTSD from the assault he experienced in 1994. ROA.1310-1311. Officers then forced Epley into the cell. They deployed a harsh chemical agent against him, and as many as six officers in riot gear piled onto his body. ROA.1311-1319. Epley suffered a blow to the head that likely broke his nose and caused a concussion, while the officers' weight on his back and sternum likely fractured his ribs. ROA.1313-1314; ROA.1342-1344; ROA.3013-3014.

### 4.    Epley Suffered Further Injuries After Returning to Lynaugh

TDCJ returned Epley to Lynaugh on June 9, 2016. ROA.3102. That day, Epley wrote down his injuries: "heavy bleeding" from his nose, which was "possibly broken"; pain in his "frontal teeth," including "at least one tooth loose"; signs of concussion, including "loss of consciousness/headaches/vomiting"; "blurred vision" in his right eye and "loss of hearing with ringing" in his right ear; "sharp/acute pains" in the right side of his chest, possibly from "broken rib(s)"; and other pains throughout his body. ROA.1342; ROA.1343-1344.

The same day, Epley saw mental health counselor Roxie Ingram, who had found his religious medallion in Lynaugh's infirmary. ROA.476. Rather than return the medallion, Ingram gave it to Robinson, who did not return it either. ROA.476; ROA.1785. Epley never got the medallion back. ROA.476.

Also on June 9, Epley spoke to Michelle Sellers, TDCJ's Director of Classification at Lynaugh. ROA.478-479. Epley asked Sellers and the Unit

7

Classification Committee for safekeeping housing, explaining that he was "more helpless and vulnerable" because of the injuries he suffered at Montford, putting him at risk of being "victimized by . . . gang members" at Lynaugh.  ROA.473. "Safekeeping is a housing status that separates vulnerable individuals from more aggressive offenders," and it is "indicated" when an inmate has "characteristics that mark the offender as vulnerable to predation."  *Johnson v. Johnson*, 385 F.3d 503, 512 (5th Cir. 2004).  Despite Epley providing Sellers the Jester IV psychiatric plan characterizing him as a "Potential Victim," and despite his visible injuries from the incident at Montford, Sellers placed Epley in the general population, surrounded by "active gang members" and prisoners with G4 custody status, the most dangerous category of prisoner allowed at Lynaugh.  ROA.474.[1]

In the following days, Epley experienced extortion and assault by other prisoners.  On June 10, a gang leader threatened Epley and ordered him to buy $20 of commissary products.  ROA.1556-1560.  After Epley refused, two gang members entered his cell on June 14, "grabbed [Epley] by his clothes and slammed him against the wall of the cell," telling him that his debt had increased to $30. ROA.1560.  The two gang members assaulted Epley the same way the next day,

---

[1] *See* Texas Dep't of Crim. Just., *Unit Directory – Lynaugh (LH)*, https://www.tdcj.texas.gov/unit_directory/lh.html ("Custody Levels Housed:  G1, G2, G4") (last visited Aug. 2, 2023).

June 15, again increasing the debt Epley owed.  ROA.1560-1561.  Epley endured two further assaults from gang members accompanied by demands for money—on June 18 and June 21—before he was finally transferred away from Lynaugh on June 23.  ROA.1568-1569.

In the meantime, Epley received minimal medical care for his Montford injuries.  On June 10, Epley was examined by Samuel Itie, a physician's assistant.  ROA.1170.  Itie understood Epley had been assaulted at Montford—that "someone jumped on him and banged his face on the concrete and beat him up."  ROA.3013.  Epley showed signs of head trauma.  He "had passed out and threw up," and he was experiencing headache, "blurry vision and dizziness upon standing."  ROA.3013.  Itie also saw signs that Epley's nose was broken, and he suspected Epley might have rib fractures and a concussion.  ROA.3013; *see also* ROA.513 (Itie noting possible "FRACTURE OF RIB(S), STERNUM AND THORACIC SPINE" and "LACERATION BACK AND PELVIS.").

Understanding the severity of Epley's condition, Itie tried to call Dr. Denise Deshields, Texas Tech's Executive Medical Director for Correctional Managed Health Care, based in El Paso.  ROA.1338-1339; ROA.1341; ROA.3013.  Itie thought Epley might need to be hospitalized and that x-rays and CT scans were needed to understand the extent of his injuries.  ROA.1341; ROA.3013.  Itie told Epley that "I know that your nose is broken because of the swelling combined with

the deviation," and that Epley was at risk of "brain herniation and death" from possible traumatic brain injury.  ROA.1314.

During the examination, however, Sellers called Itie and asked to speak with him.  ROA.471.  Itie told Epley to wait in the hall while he spoke to Sellers outside Epley's hearing.  ROA.471-472; ROA.1341.  After that conversation, Itie promptly ended the examination without arranging for Epley to be hospitalized, trying again to contact Dr. Deshields, or providing Epley anything more than basic over-the-counter medications.  ROA.472; ROA.1341.  No doctor examined Epley to produce a definitive diagnosis of his injuries.  Itie waited four days before doing another short examination of Epley, and 12 days before finally arranging x-rays.  ROA.482; ROA.3102.  Epley declined, seeking to avoid any medical hold that might prolong his confinement at Lynaugh.  ROA.482; ROA.1251-1252.  He was transferred away from Lynaugh the next day, June 23.  ROA.3102.

## B.    Procedural History

In May 2018, soon after his release from prison, Epley sued in the Northern District of Texas.  ROA.3.  After transfer under 28 U.S.C. § 1404(a) from the Dallas Division to the Lubbock Division based on convenience, Epley filed an amended complaint stating claims against employees of the Montford, Robertson, and Lynaugh Units and other Texas officials.  ROA.233-234; ROA.247-255.

A magistrate judge in Lubbock then entered a *sua sponte* order ruling that

10

Epley had filed claims against the Robertson and Lynaugh defendants in "the wrong division and/or district." ROA.359. Accordingly, the magistrate judge severed Epley's case in three, sending some claims to the Northern District's Abilene Division and others to the Western District's Pecos Division. ROA.359-360. Epley then had to litigate on three fronts.[2]

In Pecos, Epley filed an amended complaint against only the Lynaugh defendants. ROA.460. A magistrate judge reviewed the claims under 28 U.S.C. § 1915(e) and permitted certain claims to proceed, including free-exercise claims against Robinson and Ingram; claims for deliberate indifference to serious medical needs against Itie and Sellers; and a failure-to-protect claim against Sellers. ROA.578-579; ROA.747-748.

In November 2020, the Lynaugh defendants moved for summary judgment, with TDCJ defendants (including Sellers and Robinson) submitting one motion and Texas Tech defendants (including Ingram and Itie) submitting another. ROA.3194-3195. The magistrate judge at first recommended rejecting most of Epley's claims on exhaustion grounds under the Prison Litigation Reform Act

---

[2] The Lubbock court dismissed Epley's claims as frivolous, but this Court reversed in 2021. *See Epley v. Gonzalez*, 860 F. App'x 310 (5th Cir. 2021) (per curiam). The Lubbock case is ongoing. *See Epley v. Gonzalez*, No. 5:18-cv-00142-BQ (N.D. Tex.). The Abilene court entered judgment against Epley in March 2023, and appeal is pending. *See Epley v. Lopez*, No. 1:18-cv-00115-C (N.D. Tex.); No. 23-10374 (5th Cir.).

("PLRA"), but the district court explained that the PLRA applies only to plaintiffs incarcerated when they file suit, which Epley was not. ROA.1838-1842; ROA.1980. Otherwise, the district court adopted the magistrate judge's recommendations that summary judgment be granted to the defendants on all claims. *See* ROA.1820-1824 (R&R on Itie); ROA.1829-1830 (R&R on Ingram); ROA.1842-1843 (R&R on Robinson); ROA.1981 (adopting R&R's); ROA.1986-1990 (R&R on Sellers); ROA.2862 (adopting R&R).

Epley's appeal timely followed. ROA.797; ROA.3199. Epley submitted his opening brief in December 2021, and Appellees responded in February 2022. In May 2023, the Court appointed *pro bono* counsel for Epley, requesting supplemental briefing.

## SUMMARY OF ARGUMENT

The district court for the Northern District of Texas erred by severing and transferring Epley's case. The transferee court in the Western District of Texas then erred by rejecting Epley's claims at summary judgment.

**I.**    Venue was proper in the Northern District of Texas under 28 U.S.C. § 1391(b)(1) because numerous defendants resided in the Northern District and all defendants were Texas residents. Venue also was proper under § 1391(b)(2) because a substantial part of the events or omissions giving rise to Epley's claims occurred there. The district court erred by disregarding § 1391(b)(1) and by

12

misapplying § 1391(b)(2).  It thus mistakenly concluded that Epley filed certain claims in the wrong venue.  The court did not consider the discretionary factors that govern transfer between proper venues, but those factors strongly disfavored severing and transferring Epley's case.

**II.**    The district court erred by rejecting Epley's claim that Robinson and Ingram violated his First Amendment right to the free exercise of religion by confiscating and withholding his TDCJ-approved religious medallion without justification.  The court erroneously found no genuine issue of material fact about whether Robinson confiscated the medallion because the court misread the record while disregarding Epley's verified declarations.  The court also erred by deciding Epley did not show he was deprived of opportunities to practice his faith; the medallion was the only religious article he had.  The court further erred in ruling that Appellees justifiably confiscated and withheld the medallion as contraband. Epley's medallion was TDCJ-approved; no TDCJ policy required taking or keeping it from him.

**III.**   The district court erred by rejecting Epley's claims against Itie and Sellers for denying him medical care for the head trauma and other serious injuries he incurred at the Montford Unit.  Itie's actions and notes indicate he recognized Epley was at substantial risk of serious harm.  But Itie did not follow up with a doctor, hospitalize Epley, or arrange scans of Epley's head injuries.  Epley thus

13

never received a doctor's definitive diagnosis of his injuries or appropriate

treatment.  Itie denied care at the behest of Sellers, a prison official without

medical qualifications, who intervened while Itie was examining Epley.

The district court erred by arbitrarily refusing to consider Epley's claim that

he was denied care for his Montford injuries, reasoning erroneously that it had

narrowed Epley's claim in its earlier dismissal ruling.  It did not and could not,

because Epley's amended complaint adequately stated claims against Itie and

Sellers for denying him the care required for his Montford injuries.  The court also

erred by ignoring Epley's summary-judgment response on Sellers' role in the

denial of medical care.  The alternate grounds for affirmance that Itie and Sellers

advance lack merit.

**IV.**     The district court erred by rejecting Epley's claim against Sellers for

failing to protect him.  Epley requested to be placed in safekeeping housing at

Lynaugh because his Montford injuries made him vulnerable to other prisoners.

By denying that request, Sellers exposed Epley to two weeks of assaults and

extortion by other prisoners.

The district court erred by requiring Epley to demonstrate physical injury.

That PLRA requirement does not apply here because Epley filed his suit after

release from prison.  In any event, the court ignored that Epley's verified

summary-judgment response detailed physical harm he suffered from multiple

14

prisoner assaults. The court also erred by confusing the issue of safekeeping with the issue of a single-cell assignment. Epley's claim concerned his custody status, which determines the type of prisoner he was held among, not simply whether he was the only prisoner assigned to his cell.

**V.**     This Court should direct the appointment of counsel on remand. This complex case involves multiple claims and defendants, with trial to come. Epley is an elderly man with diminished capacity who lives abroad. He would face great difficulty handling a trial alone.

## STANDARD OF REVIEW

Transfer rulings are reviewed for abuse of discretion. *See In re Spillman Dev. Grp., Ltd.*, 710 F.3d 299, 307 (5th Cir. 2013). "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) (en banc).

Because the district court adopted the magistrate judge's reports and recommendations on Epley's claims, the magistrate judge's rulings are the appropriate object of this Court's review. *See Leigh Ann H. v. Riesel Indep. Sch. Dist.*, 18 F.4th 788, 794-95 (5th Cir. 2021); *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 232 n.2 (5th Cir. 2019).

Summary judgment is reviewed *de novo*, using the same standard as the

district court. *Lozano*, 41 F.4th at 491. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts and inferences are construed in the light most favorable to the non-movant. *Lozano*, 41 F.4th at 491.

To overcome qualified immunity at summary judgment, the plaintiff must "(1) raise a fact dispute on whether his constitutional rights were violated by the defendants' individual conduct, and (2) show those rights were clearly established at the time of the violation." *Rogers v. Jarrett*, 63 F.4th 971, 975 (5th Cir. 2023) (internal quotation marks omitted).

## ARGUMENT

## I.    The District Court Erred By Severing and Transferring Epley's Case

### A.    Venue Was Proper in the Northern District of Texas

Venue is governed by 28 U.S.C. § 1391, which provides that "[a] civil action may be brought in . . . (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"; or if those do not apply, (3) in any district where personal jurisdiction is proper. *Id.* § 1391(b). To decide whether venue is proper, "the court must determine whether the case falls within one of the three categories set out in

16

§ 1391(b)." *Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 56 (2013).

Epley's complaint satisfied § 1391(b)(1)'s requirements that "all defendants" be residents of the state and that the suit be pending in the district in which "any defendant" resides. *See, e.g.*, *Rush v. Fischer*, 923 F. Supp. 2d 545, 556 (S.D.N.Y. 2013) (venue for prisoner's suit proper in W.D.N.Y. because three defendants resided there and remainder resided in New York); *White v. Wexford Health Sources, Inc.*, 2012 WL 3913956, at *2 (N.D. Miss. Sept. 7, 2012) (venue for prisoner's suit proper in N.D. Miss. because at least one defendant resided there and remainder resided in Mississippi); *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1105 (N.D. Cal. 2001) (venue for prisoner's suit proper in N.D. Cal. because one defendant resided there and remainder resided in California); *Smiley v. Reno*, 131 F. Supp. 2d 839, 841 (W.D. La. 2001) (venue for prisoner's suit proper in W.D. La. or M.D. La. because all defendants resided in the two districts).

Epley's June 2018 amended complaint stated claims against employees of the Montford, Robertson, and Lynaugh Units and other Texas officials. ROA.247-255 (complaint); ROA.358 (severance order). Fourteen named defendants were employees of Montford or Robertson, both located in the Northern District. ROA.247. A natural person "reside[s]" where they are "domiciled." 28 U.S.C. § 1391(c)(1). Section 1391(b)(1) would be satisfied by "any" of these 14

17

defendants residing in the Northern District, and most, if not all, TDCJ employees likely are domiciled near where they work.  The remaining defendants were other Texas employees or officials for whom the same is true.

Satisfying § 1391(b)(1) ends the § 1391 inquiry.  If "the case falls within one of the three categories set out in § 1391(b)," "venue is proper."  *Atlantic Marine*, 571 U.S. at 56; *see id.* ("The structure of the federal venue provisions confirms that they *alone* define whether venue exists in a given forum.") (emphasis added).

Venue was also proper in the Northern District under § 1391(b)(2), because "a substantial part of the events or omissions giving rise to" Epley's claims occurred there.  28 U.S.C. § 1391(b)(2).  A "venue does not have to be the place where the most relevant events took place," as long as its "contacts" to the claims are "substantial."  *McClintock v. School Bd. E. Feliciana Par.*, 299 F. App'x 363, 365 (5th Cir. 2008) (per curiam).

At the center of Epley's case was the Montford officers' use of force on June 6, 2016, that caused him "severe injuries."  ROA.259.  These injuries undergirded his claims against the Lynaugh defendants.  Itie and Sellers denied him medical care for these injuries.  ROA.265-267.  Sellers failed to protect Epley by denying him safekeeping housing, which he needed because the Montford injuries left him vulnerable.  ROA.267-268.  And Epley experienced injury from Robinson's June 2 confiscation of his religious medallion at Montford, because he was deprived of its

18

religious support during his traumatic experiences there.  ROA.268-269.

Finally, it was appropriate for Epley to state claims against defendants at three TDCJ units in one action.  Defendants may be joined in one action if "any right to relief is asserted against them . . . with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" or if "any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2)(A)-(B).  Epley's complaint satisfied both prongs because it concerned a series of occurrences involving common questions of fact:  his transfer from Lynaugh to Montford to Robertson and back to Lynaugh between June 2 and 9, 2016, and his treatment at Lynaugh through his departure on June 23.  ROA.256-283, ROA.319.

### B.     The District Court Misapplied the Venue Statute

The district court's *sua sponte* order misapplied 28 U.S.C. § 1391(b) in concluding that Epley filed his claims in the "wrong" venue because the court overlooked that Epley satisfied § 1391(b)(1), the residential-venue prong.  ROA.359.[3]  The court did not analyze whether Epley had properly joined all defendants in one case.  Instead, it noted simply that Epley had claims against defendants at the Robertson Unit in the Northern District's Abilene Division and at

---

[3] Epley timely objected to the severance-and-transfer order.  *See Epley v. Gonzalez*, No. 5:18-cv-00142-BQ (N.D. Tex.), ECF Nos. 38, 39 (denying reconsideration).  Epley also objected in the Pecos court.  ROA.565.

19

Lynaugh in the Western District. ROA.359. Because "'a substantial part of the events or omissions giving rise' to these claims occurred in the Abilene Division and Western District of Texas," the court concluded Epley had filed his claims against those defendants "in the wrong division and/or district." ROA.359. It then applied 28 U.S.C. § 1406(a), which authorizes dismissal or transfer when a case is filed "in the wrong division or district." *Id.*

The district court did not consider § 1391(b)(1) and defendants' residency. Its recitation of legal standards also mistakenly paraphrased § 1391(b)(1) as requiring that suits be brought where "the defendant resides." ROA.358-359. But the text of the statute—permitting suit in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"—expressly contemplates suits against multiple defendants who reside across a multi-district state. 28 U.S.C. § 1391(b)(1). Because the district court overlooked that venue was proper under § 1391(b)(1), it was error to apply § 1406(a). *See Atlantic Marine*, 571 U.S. at 59 ("[B]ecause § 1391 made venue proper, venue could not be 'wrong' for purposes of § 1406(a).").

If the court had reasons to doubt that § 1391(b)(1) applied, its order did not state them. Nor did the court allow Epley to amend his complaint or explain why he sued all defendants in the Northern District. Because Epley's suit was against only Texas state employees and about events only in Texas, the court's *sua sponte*

severance without allowing Epley to respond was unreasonable under the liberal standard for reviewing *pro se* pleadings. *See Lozano*, 41 F.4th at 490.

Even if venue is proper, a court may transfer a case in "the interest of justice" under 28 U.S.C. § 1404(a). *See Atlantic Marine*, 571 U.S. at 62-63 & n.6 (listing public- and private-interest factors). But the court did not apply § 1404(a) or this Court's tailored analysis for combined severance-and-transfer decisions. *See In re Rolls Royce Corp.*, 775 F.3d 671, 680-81 (5th Cir. 2014) (specifying "different" inquiry "more focused on judicial efficiency" when severance and transfer are combined). The court's severance and transfer of Epley's case thus rested only on its erroneous application of § 1391 and § 1406(a).

The district court cited *Hardwick v. Brinson*, 523 F.2d 798 (5th Cir. 1975), *see* ROA.359, but *Hardwick* counsels the opposite approach. There, a prisoner filed suits in Georgia's three federal districts about the same conduct, and this Court ordered that he proceed only in one. 523 F.2d at 799-801. Here, the district court fostered the reverse outcome, erroneously turning one case into three.

## C.    Discretionary Severance and Transfer Were Improper

When the district court severed Epley's case, it failed to apply either

§ 1404(a) or this Court's precedent on combined severance-and-transfer decisions.

The severance and transfer here were improper under both analyses.[4]

Transfer generally requires that "good cause" be "clearly demonstrate[d]."

*Volkswagen*, 545 F.3d at 315.  Transfer under § 1404(a) turns on balancing public-

and private-interest factors:

> The private interest factors are:  "(1) the relative ease of access to
> sources of proof; (2) the availability of compulsory process to secure
> the attendance of witnesses; (3) the cost of attendance for willing
> witnesses; and (4) all other practical problems that make trial of a case
> easy, expeditious and inexpensive."
>
> The public interest factors are:  "(1) the administrative difficulties
> flowing from court congestion; (2) the local interest in having
> localized interests decided at home; (3) the familiarity of the forum
> with the law that will govern the case; and (4) the avoidance of

---

[4] Following transfer, the Lubbock court denied Epley's motion for
consideration and provided a *pro forma* § 1404(a) analysis.  *See Epley v. Gonzalez*,
No. 5:18-cv-00142-BQ (N.D. Tex.), ECF No. 43 at 2 ("In the court's view, the
overall availability and convenience of the witnesses and parties, the cost of
obtaining witness attendance, the relative ease of access to proof, and the place of
the alleged wrong, outweigh any other considerations for location of the
appropriate forum.").

Because that decision postdated the transfer, it is doubtful that this Court has
appellate jurisdiction to review it.  The original order merged with the final
judgment in this case, *see Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 220
(5th Cir. 2000), but the Lubbock case remains pending.  In any event, the court's
scant reconsideration analysis is unpersuasive.  It ignores the precedent on
combined severance-and-transfer decisions, and severance was profoundly
*inconvenient* to Epley.

> unnecessary problems of conflict of laws [or in] the application of
> foreign law."

*Id.* (brackets in original) (quoting *In re Volkswagen AG*, 371 F.3d 201, 203 (5th

Cir. 2004) (per curiam)).  "The Court must also give some weight to the plaintiffs'

choice of forum."  *Atlantic Marine*, 571 U.S. at 62 n.6.

When transfer is combined with severance, "[a] court must 'weigh carefully'

the comparative inconvenience of splitting the suit versus the advantages to be

gained from a partial transfer."  *Defense Distributed v. Bruck*, 30 F.4th 414, 428

(5th Cir. 2022) (quoting *Liaw Su Teng v. Skaarup Shipping Corp.*, 743 F.2d 1140,

1148 (5th Cir. 1984)); *Rolls Royce*, 775 F.3d at 680 (same).  Severance is

disfavored when "partial transfer would require the same issues to be litigated in

two places," because "Plaintiffs are disadvantaged by the expense and

inconvenience of having to litigate in two disparate fora and by the possibility of

inconsistent results."  *Defense Distributed*, 30 F.4th at 428.  And "judicial

economy" plays "a cardinal role" in the analysis.  *Rolls Royce*, 775 F.3d at 681.

Thus, "in most multidefendant cases . . . severance and transfer makes sense only

where the administration of justice would be materially advanced and a defendant

in one district is not 'so involved' in the transferred controversy that the same

issues would have to be litigated twice."  *Defense Distributed*, 30 F.4th at 429.

To start, Epley's choice of the Northern District was entitled to weight.

Next, no public-interest factors favored severance and transfer.  The severance

burdened three federal courts, rather than one.[5]  No corresponding benefit arose from honoring local interests, exploiting the transferee court's familiarity with law, or avoiding conflict of laws, because transfer was between federal courts in Texas equally capable of applying federal law, and all claims concerned state employees.

Private-interest factors also disfavored severance and transfer.  The decision severely disadvantaged Epley, a *pro se* litigant, tasking him with litigating across three federal courts and developing a common set of facts three times.  As for the defendants, who did not even request the severance, it obligated them to present duplicative evidence on common facts, with no attendant benefit.  And all defendants and relevant witnesses either were Texas state employees or inmates in TDCJ custody, any of whom TDCJ or Texas Tech could make available at will. Indeed, TDCJ's crisscrossing transfers of Epley all over Texas in June 2016 shows its logistical capacities.

This Court's severance-and-transfer precedents reinforce these points.  The severance and transfer here disserved the "cardinal" consideration of judicial economy, *see Rolls Royce*, 775 F.3d at 681, because they created complication and duplication across courts.  Epley's intertwined claims against the Montford, Robertson, and Lynaugh defendants meant "that the same issues would have to be

---

[5] The severance also burdened this Court with piecemeal appeals:  one already in *Gonzalez*, this appeal, and another pending in *Lopez*.

24

litigated twice," *Defense Distributed*, 30 F.4th at 429, if not three times. When claims against multiple defendants "are temporally and factually intertwined," as here, severance and transfer are inappropriate. *Id.* at 430.[6]

Should Appellees argue that reviewing the severance-and-transfer decision after final judgment is improper, this Court has reviewed venue-transfer rulings following final judgment before. *See Spillman*, 710 F.3d at 307; *Empire Indem. Ins. Co. v. N/S Corp.*, 571 F. App'x 344, 346 (5th Cir. 2014) (per curiam). And while this Court has questioned whether appeal of a transfer order after final judgment can provide effective relief, it has made those remarks to justify considering a mandamus petition. *See, e.g.*, *Volkswagen*, 545 F.3d at 319. No doubt mandamus enables more timely relief. But Epley, a *pro se* litigant, should not be faulted because he did not pursue mandamus, an "extraordinary remedy." *Rolls Royce*, 775 F.3d at 675. And effective relief remains possible here because the severed Lubbock action is still pending.

---

[6] *Newton v. Stringfellow*, 93 F. App'x 615 (5th Cir. 2004) (per curiam), affirming a severance and transfer of prisoner claims, does not justify the district court's action. *Newton* involved seven plaintiffs, and their claims did not all "arise out of the same occurrences." *Id.* at 617.

## II.    The District Court Erred By Rejecting Epley's Free-Exercise Claims

### A.    Robinson and Ingram Violated Epley's Right to Free Exercise

Robinson and Ingram violated Epley's right to free exercise under the First Amendment by confiscating and not returning his religious medallion. "[R]easonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) (per curiam).  It is clearly established that deprivation of religious articles like medallions can constitute "a violation of [a] substantive constitutional right" under the First Amendment. *Bankhead v. Mannix*, 983 F.2d 1061 (5th Cir. 1993) (summary calendar); *see also Jackson v. Godwin*, 400 F.2d 529, 533-34 (5th Cir. 1968) (collecting cases on confiscation or denial of religious medals); *Ortiz v. Downey*, 561 F.3d 664, 669-70 (7th Cir. 2009) (permitting Catholic prisoner's free-exercise claim based on denial of rosary beads); *Kay v. Bemis*, 500 F.3d 1214, 1220-21 (10th Cir. 2007) (permitting Wiccan prisoner's claim based on deprivation of tarot cards).[7]

Prison officials can restrict a prisoner's religious exercise only if the restriction "is reasonably related to legitimate penological interests." *McFaul v.*

---

[7] *See also Mitchell v. Diaz*, 2022 WL 4124797, at *7 (E.D. Cal. Sept. 9, 2022) (allowing free-exercise claim about confiscation of religious medallion); *Shatner v. Page*, 2009 WL 260788, at *29-34 (S.D. Ill. Feb. 4, 2009) (awarding judgment and damages to prisoner for confiscation of religious medallion); *Shaheed-Muhammad v. Dipaolo*, 138 F. Supp. 2d 99, 103-04, 110 (D. Mass. 2001)

*Valenzuela*, 684 F.3d 564, 572 (5th Cir. 2012) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  Whether the restriction is reasonable depends on "(1) whether the regulation or action has a logical connection to the legitimate governmental interests invoked to justify it; (2) whether the inmate has an available alternative means of exercising the rights; (3) the impact of accommodation on other inmates, guards, and prison resources; and (4) the presence or absence of ready alternatives that fully accommodate the prisoner's 'rights at *de minimis* cost to valid penological interests.'" *Id.* (quoting *Turner*, 482 U.S. at 91).

Epley's religious medallion was a Celtic cross that he acquired from a TDCJ-approved vendor and that the Ramsey Unit's warden and chaplain approved. ROA.1696; ROA.1794.  Epley's verified summary-judgment response stated that he held onto the medallion through transfers at Huntsville and Abilene before arriving at Lynaugh on June 2.  ROA.1783.  When Epley arrived at Lynaugh, Robinson removed the medallion from around Epley's neck and placed it in the infirmary, without giving a justification, checking to see that the medallion was approved, or logging it for safekeeping with Lynaugh's duty property officer. ROA.1574; ROA.1782.  Epley was transferred to Montford later that day.  Thus, he had to go through his days at Montford—enduring severe stresses and

---

(denying defendants' motion for judgment on the pleadings as to free-exercise claim arising from confiscation of religious medallion).

injuries—without the support and comfort he derived from his medallion.

Epley returned to Lynaugh on June 9 and saw Ingram that day.  ROA.476.
According to Epley's verified complaint, he "asked her about his religious
medallion which she found concealed/hidden at the nurse station."  ROA.476.  But
rather than return it to him, or to the property officer, Ingram gave it to Robinson,
who did not return it to Epley either.  ROA.476; ROA.1785.  Epley never got the
medallion back.  ROA.476.

The medallion had immense significance for Epley.  In a grievance, Epley
described it as "a much-needed and essential religious devotional item."
ROA.3096.  It was "spiritually precious" to Epley because it helped him deal with
his PTSD and manage the pain and isolation of prison.  ROA.1785; ROA.1787.
Losing the medallion caused him severe anguish and inhibited his ability to
practice his religion.  ROA.1787.  At Lynaugh and Montford, Epley had no other
religious articles or texts to use, and no worship community or service to join.
ROA.475.  Robinson's and Ingram's actions thus left Epley no other means of
practicing his faith, "entirely stifl[ing]" his religious exercise.  *See Scott v.
Mississippi Dep't of Corr.*, 961 F.2d 77, 81 (5th Cir. 1992).

28

**B.    The Magistrate Judge Committed Both Factual and Legal Error**

**1.    Genuine issues of material fact exist regarding Appellees'
actions**

**a.**  The magistrate judge erred by finding no genuine issue of material fact
that Robinson confiscated or Ingram withheld Epley's medallion.  ROA.1830;
ROA.1843.  The magistrate judge reasoned that an Offender Property Inventory
("OPI") sheet for Epley dated May 27, 2016, showed Epley had the medallion,
while another OPI sheet dated May 31, 2016, did not.  ROA.1830 (citing
ROA.1180-1181).  Despite conceding such forms are "not infallible," the
magistrate judge inferred from the two forms that Epley had no medallion when he
arrived at Lynaugh on June 2, so Robinson could not have confiscated it and
Ingram could not have withheld it.  ROA.1830; ROA.1843.

This conclusion is mistaken for three reasons.  *First*, the magistrate judge
ignored Epley's statements in his complaint and summary-judgment response—
both verified under 28 U.S.C. § 1746—that Robinson took the medallion on June
2.  *See* ROA.463, ROA.475; ROA.1781-1782.  Statements verified under § 1746
are competent summary-judgment evidence, and it is reversible error to ignore
them when they create issues of material fact.  *See Davis v. Fernandez*, 798 F.3d
290, 292-93 (5th Cir. 2015) (district court erred by disregarding jail inmate's
§ 1746 declaration at summary judgment); *Owens v. Hinsley*, 635 F.3d 950, 955
(7th Cir. 2011) (district court erred by disregarding summary-judgment response

that *pro se* prisoner verified under § 1746); *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) (per curiam) (district court erred by disregarding complaint verified under § 1746 at summary judgment).  The magistrate judge did not identify any problem with the form or nature of Epley's verified statements; he simply disregarded them.

*Second*, contemporaneous documents support Epley's account.  On June 30, 2016, Epley filed a grievance alleging that Robinson had "intentionally inappropriately confiscated [his] religious medallion" on June 2 and that Ingram had not returned the medallion to him on June 9.  ROA.3095.  Epley's grievance also alleged that Robinson told him on June 20 that he had taken the medallion.  ROA.3095.  A TDCJ grievance investigator later corroborated that "Sgt. Robinson did speak to [Epley] about his property" but could not confirm "what advise [sic] was given to [Epley] about the location of [his] property."  ROA.3101.

*Third*, the OPI sheets are unreliable.  The magistrate judge emphasized the change from May 27, which showed the medallion, to May 31, which did not.  But the sheet from one day earlier, May 26, did not show Epley had a medallion either, ROA.1182, even though he had worn the medallion for years.  The magistrate judge thus was wrong to see the change from the May 27 sheet to the May 31 sheet as proving Epley lacked the medallion when he arrived at Lynaugh.  Viewing the OPI sheets in the light most favorable to Epley, the clearest inference they yield is

30

that they are not reliable, much less dispositive, about when Epley had his medallion and when it was taken.

**b.**  Appellees disregard these points and fail to defend the magistrate judge's errors.  Ingram says that she "does not recall finding Epley's medallion," and she reiterates the magistrate judge's misreading of the May 27 and May 31 OPI sheets to dispute that Epley even brought the medallion to Lynaugh.  Brief of Appellees Ingram, Itie, and Fuentes ("Texas Tech Br.") 18-19.  A mere failure to recall is not evidence, and the OPI sheets are not dispositive, as noted.

Robinson acknowledges Epley's grievance on June 30, 2016, charging him with taking the medallion.  Brief of Appellees Sellers, Gonzales, Robinson, and Melero ("TDCJ Officials' Br.") 27; ROA.3095.  But Robinson miscasts the grievance, claiming Epley only suggested Robinson may have acted carelessly in misplacing the medallion.  TDCJ Officials' Br. 27-28.  Robinson ignores the headline charge in Epley's grievance:  that Robinson had "intentionally inappropriately confiscated [his] religious medallion" on June 2.  ROA.3095.  That has been Epley's position all along.

Robinson also cites a statement he gave to a TDCJ grievance investigator in July 2016 that he told Epley "on the day he was placed on direct [medical] observation [that] all of his personal items as well as State Clothing were bagged and placed outside the door in the infirmary."  TDCJ Officials' Br. 28 (brackets in

original) (quoting ROA.3099).  This incriminates Robinson more than it excuses him; it is a contemporaneous admission that he took all of Epley's personal items.

Lastly, Robinson appears to suggest that, because other TDCJ personnel filled out confiscation forms when they took items from Epley on other occasions, the lack of a confiscation form for the medallion on June 2 means he did not take the medallion then.  *Id.*; ROA.3156-3164.  Those forms show only that other TDCJ employees sometimes did better record-keeping than Robinson.  Robinson's failure to complete a form merely adds to the genuine issues of material fact; it does not eliminate them.

### 2.    Appellees' actions were unreasonable

The magistrate judge erred in concluding that, even if Robinson confiscated and Ingram withheld the medallion, their actions were reasonable and Epley suffered no free-exercise violation.  The judge reasoned that Epley had not alleged that "confiscation of his medallion deprived him of opportunities to exercise his faith."  ROA.1843.  And he suggested that Epley's medallion was contraband that Robinson had grounds to take and Ingram had grounds to withhold.  ROA.1829-1830; ROA.1843.[8]  Both rationales lack merit.

---

[8] Robinson does not defend the contraband rationale on appeal.  He argues only that he did not actually take Epley's medallion.  TDCJ Officials' Br. 27-29.

**a.**  The magistrate judge's failure to consider Epley's verified complaint and § 1746 declaration dooms the rationale that Epley had other opportunities to practice his faith.  *See supra* pp. 29-30.  The judge did not consider Epley's allegation that he had no religious literature or articles besides the medallion when he arrived at Lynaugh.  ROA.475.  The medallion was the last aid to his religious exercise he had beyond his own mind and body.

This fact distinguishes *Walsh v. Louisiana High School Athletic Ass'n*, 616 F.2d 152 (5th Cir. 1980), which Ingram cites to argue that Epley experienced only a "*de minimis* burden" on his religious exercise.  Texas Tech Br. 27.  The facts of *Walsh* are far removed.  *Walsh* concerned a Louisiana sports association's rule that had the effect of disqualifying Lutheran students from interscholastic sports for one year.  This Court upheld the rule because the students still could "actively practice the Lutheran faith" and "obtain the religious education provided by [the Lutheran] school."  616 F.2d at 158.  Epley had nothing other than his medallion.

Thus, the magistrate judge's ruling goes well beyond other prison restrictions on religion this Court has permitted.  When the Court upheld a TDCJ policy barring medallions worth more than $25, there were two approved medallions the plaintiff could have used instead.  *See McFaul*, 684 F.3d at 572.  When the Court upheld another TDCJ policy banning Odinist rune stones, Odinist prisoners had access to religious literature and other approved items besides rune

33

stones. *See Mayfield v. Texas Dep't of Crim. Just.*, 529 F.3d 599, 609-11 (5th Cir. 2008). *See also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351-52 (1987) (upholding restriction inhibiting Muslim inmates' participation in particular service because they could congregate at other times and received other accommodations). Here, Robinson's and Ingram's actions left Epley with nothing.

**b.** The magistrate judge's contraband rationale is erroneous too. To justify Robinson's confiscation of the medallion, the magistrate judge cited a declaration by Ingram for the idea that "TDCJ policy requires contraband to be relinquished to TDCJ officials in order to maintain prison security." ROA.1843. Ingram echoes this in her brief. Texas Tech Br. 18. But at summary judgment, Ingram made only the limited claim that "if [she] found [Epley's] religious medallion," *but Epley was not present to take it back*, TDCJ policy would require her to turn over the unattended property to TDCJ officials. ROA.1175. Ingram acknowledged the medallion should have been returned to Epley: she would have given it back "if he was still in the medical office when I found it." ROA.1175. Ingram made no claim that TDCJ policy required confiscating the medallion in the first place. To the contrary, TDCJ policy allows prisoners to possess approved medallions, like Epley's. ROA.1696.

Because the magistrate judge's rationales are erroneous, and Appellees have articulated no other "legitimate penological interests" that their actions served,

*McFaul*, 684 F.3d at 572, this Court should reverse and remand for trial.

### III.    The District Court Erred By Rejecting Epley's Claims Against Itie And Sellers For Denial Of Medical Care

### A.    Itie and Sellers Unconstitutionally Denied Medical Care to Epley

Itie and Sellers violated the Eighth Amendment by denying Epley emergency medical care for the injuries he sustained at the Montford Unit. Itie understood Epley had severe injuries possibly requiring hospitalization, but at Sellers' behest, Itie gave Epley minimal treatment and never arranged for a doctor to examine him.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain" and is "proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05 (footnotes omitted). Deliberate indifference is manifest when an "official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[A]n Eighth Amendment claimant need [only] show . . . that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "[A] serious medical need is one for which treatment has been recommended

or for which the need is so apparent that even laymen would recognize that care is required." *Sims v. Griffin*, 35 F.4th 945, 949 (5th Cir. 2022).

It is clearly established that prison personnel violate prisoners' constitutional rights by denying or delaying care for significant injuries and conditions. *See id.* at 950 (34-hour failure to seek medical treatment for detainee who swallowed toxic substances); *Easter v. Powell*, 467 F.3d 459, 461-65 (5th Cir. 2006) (per curiam) (four-hour delay in treatment for chest pain); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (two-hour delay in obtaining emergency care for inmate unconscious and vomiting due to heat); *Harris v. Hegmann*, 198 F.3d 153, 154-55, 159-60 (5th Cir. 1999) (per curiam) (eight-day delay in treating broken jaw); *cf. Colle v. Brazos County, Tex.*, 981 F.2d 237, 246 (5th Cir. 1993) (jail staffed only "with persons having no authority to transfer a seriously ill detainee to a hospital").

Epley returned to Lynaugh on June 9, 2016, with severe injuries and signs of head trauma from the force used against him at Montford. Epley detailed his injuries in a note the same day: "heavy bleeding" from his nose, which was "possibly broken"; pain in his "frontal teeth," including "at least one tooth loose"; signs of concussion, including "loss of consciousness/headaches/vomiting"; "blurred vision" in his right eye and "loss of hearing with ringing" in his right ear; "sharp/acute pains" in the right side of his chest, possibly from "broken rib(s)"; and other pains throughout his body. ROA.1342; ROA.1343-1344.

Clinic notes by Itie the next day, June 10, corroborate these injuries, indicating Itie knew of "a substantial risk of serious harm" to Epley. *Farmer*, 511 U.S. at 842; ROA.3013-3014. Itie understood Epley had been assaulted at Montford: "someone jumped on him and banged his face on the concrete and beat him up." ROA.3013. As a result, Epley "had passed out and threw up," and he was experiencing headache, "blurry vision and dizziness upon standing," and pain "particularly on the [right] side of the chest." ROA.3013. Itie also saw signs that Epley's nose was broken: contusion and swelling on the nasal bridge, which was "deviated," and "subjective pain on palpation of nose." ROA.3013. Itie suspected Epley might have rib fractures and a concussion. ROA.3013; *see also* ROA.513 (Itie noting possible "FRACTURE OF RIB(S), STERNUM AND THORACIC SPINE" and "LACERATION BACK AND PELVIS.").

Itie understood on June 10 that Epley's condition potentially was serious. His notes record that he tried to call a "Dr. Deshields" but could not reach her. ROA.3013. Dr. Deshields was no ordinary doctor: Denise Deshields, Texas Tech's Executive Medical Director for Correctional Managed Health Care, based in El Paso. ROA.1338-1339. Itie's notes also record his view that x-rays and CT scans may be needed to understand the extent of Epley's injuries. ROA.3013. A note from Epley to Itie on June 15 recounts more statements Itie made during the June 10 appointment:

> [Y]ou appeared to be quite alarmed at my injuries.  You stated that
> you needed to place an emergency tel-call to the highest medical
> doctor for "Texas Tech" (i.e., the provider of medical services in this
> area) to have me rushed to a nearby "free-world" hospital to have:
> - A CT scan done to check my brain for bleeding and swelling,
> - X-rays done to confirm that my nose, ribs … were broken.

ROA.1341.  Similarly, in response to a questionnaire by the Lubbock court, Epley

recalled Itie telling him during the June 10 examination:  "I know that your nose is

broken because of the swelling combined with the deviation."  ROA.1314; *see*

ROA.1247 (incorporating questionnaire answers into summary-judgment

response).  Itie also said that "he feared that I could have sustained a Traumatic

Brain Injury which could endanger my life because of a subdural hematoma, which

could cause a brain herniation and death."  ROA.1314.

But Itie did not follow up with a doctor, hospitalize Epley, or arrange scans

of Epley's head injuries.  Epley thus never got a doctor's definitive diagnosis of his

injuries or appropriate treatment for them.  Instead, Itie gave Epley only Tylenol

and bed rest.  ROA.3013.  Itie did not see Epley for another four days.  On June 14,

Itie recorded that Epley still had shoulder and rib pain, aggravated when he

coughed.  ROA.3011.  Epley also was experiencing a "pulsating [headache], with

nausea, photophobia and phonophobia," as well as dizziness.  ROA.3334.  Yet Itie

"rushed [Epley] out" of the appointment and still did not arrange x-rays or other

scans.  ROA.3039.  It took until June 22—16 days after the Montford incident and

12 days after Itie first examined Epley—before x-rays were arranged.[9]

Itie also took Epley off his treatment regimen for migraine headaches that doctors had prescribed to Epley years earlier.  ROA.3039.  Epley's prison assault in 1994 caused him traumatic brain injury and lasting migraine headaches.  ROA.1347.  Accordingly, neurologists at Hospital Galveston had prescribed him a regimen of Verapramil, Phenergan, and Imitrex at least as early as 2007.  ROA.1347-1350.  Itie departed from this regime, for no evident reason.

The foregoing creates a genuine issue of material fact about Itie's deliberate indifference to the serious medical risks facing Epley from his Montford injuries.  Itie recognized the need for a doctor's consultation and possibly hospitalization, as well as x-rays and CT scans.  But Itie never hospitalized Epley or procured a doctor who could have definitively diagnosed his injuries, while scans were delayed more than 10 days, even as Epley continually demonstrated signs of significant trauma to the head.  *See Sims*, 35 F.4th at 952 (qualified immunity denied where "each officer knew Qualls had asked to go to the hospital, and no officer took him or otherwise sought medical assistance for him"); *Harris*, 198 F.3d at 154-55, 159-60 (Eighth Amendment violation adequately stated where "no

---

[9] Epley declined the x-rays on June 22, 2016, because he did not want to trigger a medical hold that might keep him at Lynaugh and delay his much-desired return to Ramsey, where he felt safer.  ROA.482; ROA.1251-1252.  He was transferred away from Lynaugh the next day.  ROA.3102.

medical professional" saw plaintiff for days despite serious injury, prolonging "constant and extreme pain").  Meanwhile, Itie took Epley off his long-standing doctor-prescribed migraine regimen and gave him only over-the-counter medications for his pain.

Itie disregarded the risks to Epley at the behest of Sellers.  Epley's June 15 note to Itie documented this, as did his verified complaint.  ROA.471-472; ROA.1341.  During Itie's June 10 examination of Epley, Itie at first recognized the need for a doctor's attention, calling Dr. Deshields, and possibly also hospitalization.  ROA.471; ROA.1341.  But midway through the appointment, Itie asked Epley to wait in the hall while Itie spoke to Sellers outside Epley's hearing.  ROA.471-472; ROA.1341.  After that conversation, Itie "promptly concluded" the appointment without arranging for Epley to be hospitalized, making further attempts to contact Dr. Deshields, or providing Epley anything more than basic over-the-counter medications.  ROA.472; ROA.1341.  Itie's abrupt reversal—with no apparent cause besides the conversation with Sellers—yields the inference that Sellers "intentionally interfer[ed]" with Epley's care.  *See Estelle*, 429 U.S. at 105.

### B. The Magistrate Judge Failed to Consider Epley's Claims Fully

The magistrate judge committed reversible error by not fully considering Epley's medical-needs claims. The magistrate judge arbitrarily narrowed Epley's claim against Itie and overlooked Epley's summary-judgment response to Sellers.

### 1. The magistrate judge erroneously narrowed Epley's claim against Itie

**a.** Though Epley's medical-needs claim against Itie centered on emergency care for his Montford injuries, the magistrate judge erroneously narrowed Epley's claim to a dispute over the drug regimen for his migraines. *See* ROA.1821-1822 ("Plaintiff's only claim against Itie relies on Itie's alleged termination of Plaintiff's medications—specifically Verapamil, Phenergan, and Imitrex."). The magistrate judge acknowledged that Epley's complaint alleged Itie mistreated his Montford injuries and that Epley's summary-judgment briefing focused on that issue. ROA.1821-1822. But the magistrate judge refused to consider these allegations and arguments, claiming that he had "previously determined that these claims should be dismissed" when he evaluated Epley's amended complaint under 28 U.S.C. § 1915(e)(2)(B). ROA.1822 (citing ROA.569). The magistrate judge thus addressed only the issue of Epley's migraine regimen, ruling for Itie based on "a cursory internet search" that appeared to support Itie's decisions and on speculation that "it may be … likely" that Itie found Epley's long-standing migraine regimen "contraindicated." ROA.1823.

The magistrate judge's narrowing of Epley's claim at summary judgment was error.  The judge's earlier dismissal ruling had done nothing of the kind.  *See* ROA.569-579.  Nor could it have.  Epley's amended complaint pleaded that he had needed "emergency medical treatment" for his Montford injuries, which Itie initially recognized on June 10 but disregarded after speaking to Sellers.  ROA.471-472.  The magistrate judge's dismissal ruling held that Epley had stated "[a] claim of deliberate indifference to his serious medical needs in violation of the Eighth Amendment by Samuel Itie," as well as "[a] claim of deliberate indifference to his serious medical needs in violation of the Eighth Amendment by Michelle Sellers."  ROA.578-579.  The judge's decision did not explain, much less choose among, the allegations supporting those claims.  Nothing in the ruling conveyed that the judge was narrowing Epley's medical-needs claims to the sole issue of Itie changing his migraine regimen, nor would that have been justified.

Tellingly, no party thought that the magistrate judge had narrowed Epley's medical-needs claim to the migraine-regimen issue.  Itie's summary-judgment motion focused on his treatment for Epley's Montford injuries, dealing with the migraine regimen only in passing.  ROA.3226-3228.  Epley's summary-judgment response did the same.  ROA.1244-1253.  And he preserved the issue in his objections to the district court.  ROA.1859-1860; ROA.1860 (highlighting Itie's failure to arrange an "emergency transfer to the free-world hospital to be evaluated

and treated by neurologists").

Thus, the magistrate judge's refusal to consider the core of Epley's medical-needs claim was arbitrary and unfounded.  This is reversible error.  *See Garcia v. Woman's Hosp. of Tex.*, 97 F.3d 810, 813 (5th Cir. 1996) (district court erred by granting Rule 50 motion without considering all theories underpinning plaintiff's Title VII claim).  Although this Court defers to a district court's interpretation of its own prior orders, *see In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 966 F.3d 351, 359 n.6 (5th Cir. 2020), the magistrate judge's transformation of an order broadly permitting Epley's medical-needs claim into a significant narrowing of that claim warrants reversal.

**b.**  Itie's brief seeks affirmance on alternate grounds.  *See* Texas Tech Br. 21-24.  Itie does not maintain the magistrate judge's mistaken view that he previously dismissed Epley's medical-needs claim about Itie's handling of his Montford injuries.  Instead, Itie (inaccurately) describes Epley's claim as "mere disagreement with the treatment he received from Itie" for the Montford injuries.  *Id.* at 21.

This Court disfavors considering alternate grounds that the magistrate judge and district court did not address.  *See Frederking v. Cincinnati Ins. Co.*, 929 F.3d 195, 200 n.2 (5th Cir. 2019) (declining to address appellee's "alternative grounds for granting summary judgment" "for the first time on appeal"); *EEOC v. Simbaki,*

*Ltd.*, 767 F.3d 475, 485 n.16 (5th Cir. 2014) (same); *Magallon v. Livingston*, 453 F.3d 268, 273 (5th Cir. 2006) (same).

But if this Court decides to address Epley's medical-needs claim against Itie "in the first instance," *Magallon*, 453 F.3d at 273, it should reverse and remand. The crux of Epley's claim is that Itie knew Epley faced a substantial risk of serious harm from his Montford injuries, including "brain herniation and death." ROA.1314. These injuries warranted a doctor's review and possibly hospitalization, yet Itie disregarded the risks at the behest of Sellers, a prison official with no medical qualifications. *Supra* pp. 36-40. This record contains sufficient issues of material fact to deny qualified immunity and remand for trial.

### 2. The magistrate judge ignored Epley's summary-judgment response to Sellers

**a.** The magistrate judge failed to give full consideration to Epley's claim against Sellers by ignoring Epley's summary-judgment response on Sellers' role in the denial of needed medical care. The magistrate judge stated that Epley made no "specific assertions against Sellers" and that there was no evidence Sellers took part in the denial of medical care. ROA.1989-1990.

But Epley did make specific assertions against Sellers. ROA.1245-1249; ROA.1253. The magistrate judge's mistaken failure to acknowledge them likely arose from reviewing only one of Epley's two summary-judgment responses in connection with the medical-needs claim against Sellers. The defendants filed two

summary-judgment motions—one by Texas Tech employees, including Itie, and one by TDCJ employees, including Sellers.  ROA.14.  In turn, Epley submitted two summary-judgment responses—one mainly responding to the Texas Tech employees, and one mainly responding to the TDCJ employees.  ROA.1237 (Texas Tech); ROA.1535 (TDCJ).  But because Epley's medical-needs claims turned on the interaction between Itie, a Texas Tech employee, and Sellers, a TDCJ employee, Epley dealt with the medical-needs claims against both of them in his Texas Tech response brief.  There, he set forth how Sellers interfered on June 10 with the hospitalization of Epley that Itie had initially viewed as necessary.  ROA.1245-1249; ROA.1253.  Epley also incorporated his verified complaint's allegations on Sellers' role, as well as his June 15 note documenting the June 10 Itie-Sellers conversation.  ROA.471-472; ROA.1246-1247.  The magistrate judge's disregard for these specific allegations is reversible error.  *See Davis*, 798 F.3d at 292-93; *Owens*, 635 F.3d at 955; *Hart*, 343 F.3d at 765.

**b.**  Like Itie, Sellers largely sets aside the magistrate judge's mistaken rationale and advances alternate grounds for affirmance.  TDCJ Officials' Br. 23-25.  This Court ordinarily declines to consider alternate grounds in the first instance.  *See Frederking*, 929 F.3d at 200 n.2.

In any event, Sellers' alternate grounds lack merit.  *First*, Sellers cites notes by nurses at the Montford Unit on June 6 and 7, 2016, that minimize the extent of

Epley's Montford injuries. TDCJ Officials' Br. 24 (citing ROA.3135; ROA.3138). For instance, where Itie observed contusion, swelling, and deviation in Epley's nasal bridge on June 10, Montford nurse Tara Flores observed "[n]o visible injuries." ROA.3135. The nurses' notes conflict with the more detailed description of Epley's injuries that Epley himself documented on June 9 and Itie documented on June 10. This conflict demonstrates, rather than disproves, a genuine dispute on an issue of material fact.[10]

*Second*, Sellers defends Itie's medical care as adequate, arguing that she could not have been culpable for any denial of care because no such denial occurred. TDCJ Officials' Br. 24-25. This is a trial defense, not a basis for granting summary judgment to Sellers. As explained, the summary-judgment record, viewed in the light most favorable to Epley, establishes genuine issues of material fact that Itie knew of and yet disregarded substantial risks of serious harm to Epley, including death. Sellers cannot be excused on this basis.

*Third*, Sellers disputes playing any role in denying medical care to Epley, pointing out that she is not mentioned in Epley's medical records. *Id.* at 23, 25.

---

[10] Epley has a medical-needs claim pending against Flores in the Lubbock court, where summary-judgment motions are still to be filed. *See Epley v. Gonzalez*, No. 5:18-cv-00142-BQ (N.D. Tex.), ECF Nos. 90 at 12 (amended complaint), 123 (scheduling order). Reversal of the Lubbock court's severance order would permit combined consideration of Epley's interrelated medical-needs claims.

Epley's contention is that Sellers dissuaded Itie from providing necessary care not in writing but in a face-to-face conversation on June 10—which Epley observed firsthand and documented contemporaneously—and that Sellers' intervention was inappropriate because Sellers lacks medical qualifications. The lack of a writing means nothing.

Otherwise, Sellers puts forward no evidence to dispute Epley's account of her June 10 conversation with Itie, such as records establishing she was elsewhere then or a sworn declaration that she spoke to Itie about different matters, not about Epley. Sellers insists only that Epley's allegation is "tenuous." *Id.* at 23. That flat assertion may persuade at trial, but it does not overcome the contrary evidence at summary judgment.

## IV. The District Court Erroneously Rejected Epley's Claim Against Sellers For Failing To Protect Him

### A. Sellers Failed to Protect Epley from Harm by Other Prisoners

Epley repeatedly sought to be placed in safekeeping housing at Lynaugh because the injuries he incurred at Montford heightened his vulnerability to assault and extortion by other prisoners. By denying safekeeping, Sellers failed to protect Epley from harm, violating the Eighth Amendment.

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (cleaned up). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for

their offenses against society." *Id.* at 834 (internal quotation marks omitted); *see also Horton v. Cockrell*, 70 F.3d 397, 401 (5th Cir. 1995) (per curiam) ("Our society does not tolerate extortion inside or outside of prison, and also does not tolerate physical assaults."). To hold a prison official liable for failing to protect a prisoner from harm, the plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm" and the official's "deliberate indifference" to the plaintiff's health or safety. *Farmer*, 511 U.S. at 834; *see supra* pp. 35-36.

It is clearly established that prison officials may be held liable when their housing and custody decisions for vulnerable inmates are deliberately indifferent to substantial risks of serious harm. "[A]n official may not simply send the inmate into the general population to fight off attackers." *Johnson*, 385 F.3d at 527 (affirming denial of qualified immunity where TDCJ defendants failed to protect vulnerable inmate from assault by rejecting his requests for safekeeping); *see also Alvarez v. Akwitti*, 997 F.3d 211, 215 (5th Cir. 2021) (prisoner potentially stated claim against warden who "exposed him to an excessive risk of harm by refusing his transfer request, despite the fact that [plaintiff] was known by other inmates as a 'snitch'"); *Longoria v. Texas*, 473 F.3d 586, 594-95 (5th Cir. 2006) (affirming denial of qualified immunity where summary-judgment record showed prison officials knew plaintiff faced risk of death unless housing assignment was

48

changed); *cf. Morgan v. Hubert*, 459 F. App'x 321, 326 (5th Cir. 2012) (protective-custody inmate faced substantial risk of serious harm from placement in recreation yard with "general prison population").

Epley first asked Sellers, Lynaugh's Director of Classification, for safekeeping housing when he arrived at Lynaugh on June 2, 2016. ROA.477-478. "Safekeeping is a housing status that separates vulnerable individuals from more aggressive offenders." *Johnson*, 385 F.3d at 512; ROA.3141 (listing "Safekeeping" custody codes P1 through P5, distinct from "General Population" custody codes G1 through G5). Safekeeping housing is "indicated when an inmate is at risk of victimization . . . or possesses other characteristics that mark the offender as vulnerable to predation." *Johnson*, 385 F.3d at 512; *see also Locke v. Terry*, 91 F.3d 140 (5th Cir. 1996), 1996 WL 400285, at *1 (per curiam) (summary calendar) (purpose of safekeeping "is to protect those inmates that are for some reason in danger of assault in general population"). On June 2, Epley provided Sellers the 1996 treatment plan prepared by a psychiatrist at Jester IV that described Epley as a "Potential Victim" and recommended "Safekeeping" to "[e]nsure patient is not a victim of physical or sexual abuse." ROA.1500; ROA.1564.

Epley again requested safekeeping housing from Sellers and Lynaugh's Unit Classification Committee when he returned from Montford on June 9. ROA.473.

Epley told them that his Montford "injuries were making him even more helpless and vulnerable," putting him at risk of being "victimized by … gang members" at Lynaugh. ROA.473. Epley "repeatedly" asked Sellers to be placed in safekeeping housing, citing the Montford injuries as an "additional emergency reason[]." ROA.473. But Sellers placed Epley in "the most dangerous housing assignment at Lynaugh," filled with "active gang members" and prisoners with G4 status, the most dangerous category of prisoner permitted at Lynaugh. ROA.473-474.[11]

In the following days, Epley faced extortion and assault by other prisoners—forms of danger "against which a prison official must protect." *Horton*, 70 F.3d at 401. Epley alleged in his verified complaint that he had to pay money to gang members to keep food he bought from the commissary; that they forced him to spend money at the commissary for them; and that they caused him "daily mistreatments/abuses." ROA.474.

Epley detailed these experiences in his verified summary-judgment response. It began on June 10, 2016, when a gang leader threatened Epley and directed him to buy $20 of commissary products. ROA.1559-1560. After Epley refused, two gang members entered his cell on June 14, "grabbed [Epley] by his clothes and slammed him against the wall of the cell," telling him that his debt had

---

[11] *See supra* note 1.

increased to $30.  ROA.1560.  This assault deepened the pain Epley was already suffering from his Montford injuries, including "excruciating pain radiating" from his ribs.  ROA.1560.  The same gang members assaulted Epley the same way in his cell the next day, June 15, again increasing the debt Epley owed.  ROA.1561-1562.  Epley endured two further assaults from gang members at Lynaugh accompanied by demands for money—on June 18 and June 21—before he was finally transferred away from Lynaugh on June 23.  ROA.1568-1569.

Ultimately, Epley was assaulted four times by other prisoners at Lynaugh, even as he tried to recuperate from the injuries he incurred at Montford.  The other prisoners' assaults and threats kept Epley in a constant state of fear and pain throughout his two weeks at Lynaugh.

### B.    The Magistrate Judge Committed Multiple Errors in Excusing Sellers' Failure to Protect Epley

**1.**  The magistrate judge erred by ruling that Epley's claim failed without a showing of physical injury.  ROA.1988.  The Supreme Court squarely rejected this proposition in *Farmer*.  *Farmer*'s concept of deliberate indifference "does not require a prisoner seeking a remedy for unsafe conditions to await a tragic event such as an actual assault before obtaining relief."  511 U.S. at 845 (cleaned up).  And some harms against which prisoners are entitled to protection are non-physical, like extortion.  *See Horton*, 70 F.3d at 401.

51

The magistrate judge's sole authority for the physical-injury requirement was *Miller v. Johnson*, 2020 WL 8361989, at *4 (E.D. Tex. Dec. 16, 2020), which followed *Jones v. Greninger*, 188 F.3d 322 (5th Cir. 1999) (per curiam). *Jones* and *Miller* both applied the PLRA rule that "a prisoner confined in [a] jail, prison, or other correctional facility" seeking to recover for "mental or emotional injury" must make "a prior showing of physical injury." *Id.* at 326 & n.3 (citing 42 U.S.C. § 1997e(e)); *Miller*, 2020 WL 8361989, at *3-4 (same). But Epley filed this suit after he was released from prison, so the PLRA does not apply. *See Bargher v. White*, 928 F.3d 439, 447-48 (5th Cir. 2019); *Janes v. Hernandez*, 215 F.3d 541, 543 (5th Cir. 2000).[12]

In any event, the magistrate judge ignored that Epley did show physical harm: the assaults by other prisoners on June 14, 15, 18, and 21. In the assault on June 14, for instance, Epley was "slammed . . . against the wall of [his] cell" and endured "excruciating pain" because of the injuries to his head and chest that he already had. ROA.1560-1561. The same happened in the later attacks. On June 18, for instance, Epley was slammed into the cell wall again, and he "f[elt] a surge of severe pain to his right side and to his head when he struck the wall."

---

[12] The district court reversed the magistrate judge's erroneous application of PLRA exhaustion for this reason, ROA.1980, but did not detect that the magistrate judge's physical-injury requirement made the same error.

ROA.1568.  Disregarding this showing was erroneous.[13]

**2.**  The magistrate judge also erred by confusing the issue of safekeeping housing with the issue of a single-cell assignment.  ROA.1986-1988.  Safekeeping housing is a custody status that determines the type of prisoner that Epley would be among, *Johnson*, 385 F.3d at 512, while a single-cell assignment is just a matter of whether Epley shared his cell with another prisoner.

It is beside the point that Epley's pre-Lynaugh "Health Summary for Classification" sheets (known as PULHES sheets) indicated single-cell assignment and that he received a single cell at Lynaugh.  ROA.1986-1987.  Epley's claim is that *circumstances changed* and Sellers did not adjust Epley's housing appropriately.  The injuries Epley suffered at Montford on June 6 constituted an "additional emergency reason[]" for changing his custody status to safekeeping when he returned to Lynaugh three days later.  ROA.473.  Before those injuries, Epley may have been able to stay in Lynaugh's general population without incident, but the injuries made him "more helpless and vulnerable" than before.  ROA.473.  That is a "substantial risk of serious harm" to which Sellers' housing

---

[13] While the magistrate judge ignored these portions of Epley's verified summary-judgment response, the district court dismissed them for lacking citations to the record.  ROA.2861.  This overlooked that Epley verified these statements under § 1746, which is reversible error.  *See Davis*, 798 F.3d at 292-93; *Owens*, 635 F.3d at 955; *Hart*, 343 F.3d at 765.

determination on June 9 was deliberately indifferent. *Farmer*, 511 U.S. at 834.

**3.** Sellers' defense of the magistrate judge's ruling repeats the magistrate judge's errors: claiming Epley showed no physical harm, despite his verified summary-judgment response; confusing safekeeping housing with single-cell assignments; and citing the inapt PULHES sheets. TDCJ Officials' Br. 16-19.

Though Sellers acknowledges that the crux of Epley's claim is his June 9 request for safekeeping based on his Montford injuries, Sellers responds by citing a June 21, 2016 grievance worksheet in which she stated that she had done an adequate job with Epley's housing assignment. *Id.* at 16-17; *see* ROA.3112. By then, Sellers' rejection of Epley's safekeeping housing request had exposed him to three, going on four, prisoner assaults. If Sellers' self-serving statement on June 21 demonstrates anything, it is her deliberate indifference to Epley's safety. If Sellers' argument is that Epley needed to reiterate his request for safekeeping even after being assaulted, she cites no law in support. Epley made his safekeeping request plain to Sellers on June 9; indeed, Sellers does not dispute that Epley did so. *See* TDCJ Officials' Br. 16. That is enough to create a genuine issue that Sellers knew of and disregarded a significant risk to Epley's safety.

Sellers' other rejoinders are no stronger. She cites a June 2 screening worksheet completed when Epley arrived at Lynaugh that noted no evidence Epley had a history of prior victimization. *Id.* at 17; *see* ROA.3153. But this worksheet

was wrong.  Recall the traumatic brain injury Epley suffered in 1994, the basis for

the single-cell assignments in the PULHES sheets on which Sellers herself relies.

ROA.1347.  Sellers also cites no evidence she had seen that worksheet when she

decided Epley's custody assignment on June 9.

Finally, Sellers cites *Atiyeh v. Capps*, 449 U.S. 1312, 1316 (1981)

(Rehnquist, J., in chambers), for the principle that prisoners are not entitled to the

housing "most pleasing to them."  TDCJ Officials' Br. 15.  Contrary to that

dismissive characterization, Epley is not seeking relief merely for housing that was

not "pleasing" to him.  Epley is seeking relief for Sellers' failure to protect him

from repeated assault and extortion.  His claim warrants remand for trial.

## V.     Counsel Should Be Appointed On Remand

This Court can instruct district courts to appoint counsel for indigent

plaintiffs if "it would advance the proper administration of justice." *Butts v.

Martin*, 877 F.3d 571, 588 (5th Cir. 2017) (ordering appointment of counsel in

complex prisoner free-exercise case).  Relevant considerations include "(1) the

type and complexity of the case; (2) whether the indigent is capable of adequately

presenting his case; (3) whether the indigent is in a position to investigate

adequately the case; and (4) whether the evidence will consist in large part of

conflicting testimony so as to require skill in the presentation of evidence and in

cross examination." *Lozano*, 41 F.4th at 492-93 (suggesting appointment in

religious-accommodations case after reversing summary judgment).

Appointment is warranted here.  This Court has already seen fit to appoint *pro bono* counsel on appeal.  This is a complex case involving distinct constitutional claims against multiple defendants.  Trial would follow remand, making this case "increasingly complicated" to manage.  *Id.* at 493.  Also, Epley is an elderly man with diminished capacity as a result of his imprisonment.  *See* Epley Br. 2 (acknowledging PTSD, traumatic brain injury, depression, and suicidal ideation).  He resides in France with doubtful ability to re-enter the United States, complicating the presentation of evidence and examination of witnesses.  He would face great difficulty presenting a case at trial alone.

## CONCLUSION

This Court should reverse the severance-and-transfer order by the district court for the Northern District of Texas and the grant of summary judgment to Appellees Robinson, Itie, Ingram, and Sellers by the district court for Western District of Texas.  It should remand to the Lubbock Division of the Northern District of Texas for consolidation with Epley's pending case and appoint counsel to assist Epley with further proceedings.

August 2, 2023

Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Ave. NW #26152
Washington, D.C. 20001
(202) 455-4399
sam@rightsbehindbars.org

Respectfully submitted,

*/s/ Matthew N. Drecun*

Matthew N. Drecun
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mdrecun@kellogghansen.com

*Attorneys for Plaintiff-Appellant Charles E. Epley*

# ADDENDUM

## TABLE OF CONTENTS

**Page**

28 U.S.C. § 1391 .................................................................................................Add.1

**28 U.S.C. § 1391**
**Venue generally**

(a) **Applicability of section.**--Except as otherwise provided by law--

    (1)    this section shall govern the venue of all civil actions brought in district courts of the United States; and

    (2)    the proper venue for a civil action shall be determined without regard to whether the action is local or transitory in nature.

(b) **Venue in general.**--A civil action may be brought in--

    (1)    a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

    (2)    a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

    (3)    if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

(c) **Residency.**--For all venue purposes--

    (1)    a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled;

    (2)    an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question and, if a plaintiff, only in the judicial district in which it maintains its principal place of business; and

(3) a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants.

(d) **Residency of corporations in States with multiple districts.**--For purposes of venue under this chapter, in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

(e) Actions where defendant is officer or employee of the United States--

(1) **In general.**--A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party.

(2) **Service.**--The summons and complaint in such an action shall be served as provided by the Federal Rules of Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action is brought.

(f) **Civil actions against a foreign state**--A civil action against a foreign state as defined in section 1603(a) of this title may be brought--

(1)     in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

(2)     in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title;

(3)     in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title; or

(4)     in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

(g) **Multiparty, multiforum litigation**--A civil action in which jurisdiction of the district court is based upon section 1369 of this title may be brought in any district in which any defendant resides or in which a substantial part of the accident giving rise to the action took place.

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2023, a true and correct copy of the foregoing has been filed electronically with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I further certify that there are no required privacy redactions to be made, the electronic submission is an exact copy of the paper document, and the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ Matthew N. Drecun
Matthew N. Drecun

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7) because, according to the word-processing system used to prepare it (Microsoft Word 2016), it contains 12,784 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word 2016 in a proportionally spaced typeface (Times New Roman, 14 point).

*/s/ Matthew N. Drecun*
Matthew N. Drecun